[Cite as *In re L.A.*, 2013-Ohio-5757.]

IN THE COURT OF APPEALS FOR CHAMPAIGN COUNTY, OHIO

IN THE MATTER OF: L.A.        :

                                          :        C.A. CASE NO.    2013 CA 33

                                          :        T.C. NO.     13JC11

                                          :         (Civil appeal from Common
                                                  Pleas Court, Juvenile Division)
                                          :

. . . . . . . . . .

# **O P I N I O N**

Rendered on the 27th day of December, 2013.

. . . . . . . . . .

CASSIE L. SCRENGI, Atty. Reg. No. 0084895, 130 W. Second Street, Suite 840, Dayton, Ohio 45402
       Attorney for Appellant, Mother

RICHARD A. MEYER, Atty. Reg. No. 0032921, One Monument Square, Suite 200, Urbana, Ohio 43078
       Attorney for Appellee, Paternal Grandmother

JANE NAPIER, Atty. Reg. No. 0061426, Champaign County Prosecutor's Office, 200 N. Main Street, Urbana, Ohio 43078
       Attorney for Appellee Champaign County Department of Job & Family

KIRK ELLIS, Atty. Reg. No. 0055275, 121 S. Main Street, Urbana, Ohio 43078
       Attorney for Appellee, Father

REBEKAH S. NEUHERZ, Atty. Reg. No. 0072093, 121 S. Main Street, Urbana, Ohio 43078
       Guardian Ad Litem

. . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the Notice of Appeal of the mother of L.A. ("Mother"), filed July 25, 2013. Mother appeals from the July 3, 2013 decision of the juvenile court that determined that it is in L.A.'s best interest to remain in the legal custody of Mother; denied parenting time to L.A.'s father ("Father"); granted visitation to L.A.'s paternal grandmother ("K.W."); and granted protective supervision to the Champaign County Department of Job and Family Services ("CCDJFS"). L.A.'s date of birth is May 8, 2009.

{¶ 2} On February 20, 2013, CCDJFS filed a Complaint alleging that L.A. was the victim of "sexual activity." The Complaint alleged that CCDJFS received a report of abuse on February 6, 2013, and that L.A. was interviewed at Nationwide Children's Hospital Child Assessment Center, in Columbus, on February 12, 2013, based upon CCDJFS's prior experience with L.A.'s family. According to the Complaint, L.A. disclosed sexual abuse by Father in the course of the interview, and L.A.'s physical examination revealed no signs of trauma. CCDJFS requested that Father's visitation with L.A. be suspended.

{¶ 3} Regarding CCDJFS's prior history with L.A., the Complaint alleged that on August 22, 2011, the agency received a report of sexual abuse involving L.A. and an unknown perpetrator. The Complaint provides that Mother took L.A. to Dayton Children's Medical Center ("DCMC") on August 21, 2011 "due to the child's vagina being red and swollen and the Child having a rash on the vaginal area and because the Child was not acting normally. It was reported the child was putting her finger in her vagina during the exam. DCMC stated concerns that the Child 'did not protect' during the physical exam and lay with legs open." According to

the Complaint, Mother reported that L.A. was with Father prior to the examination. The Complaint further alleged that CCDJFS was unable to interview L.A. at the time due to L.A's "limited verbal skills." Subsequent examinations of L.A. were normal, and "[u]pon completion of CCDJFS' investigation the report was unsubstantiated."

{¶ 4} Additionally, the Complaint provides that CCDJFS received a report of sexual abuse on June 6, 2012 involving L.A. and Father, in which L.A. told Mother that Father "'touched pee pee,'" and "'pee pee hurt.'" According to the Complaint, in the course of an attempted interview with L.A., the child repeatedly left the interview room to join Mother in another room and did not disclose sexual abuse by Father. The Complaint provides that the reported abuse was unsubstantiated.

{¶ 5} The Complaint alleges that Father contacted CCDJFS after learning of the June, 2010 investigation and denied touching L.A. The Complaint alleges that Father reported that K.W. and another adult were always present to supervise his visitations with L.A., and that L.A. told him that Mother "says those things" that were in the report. CCDJFS sought to have L.A. adjudicated an abused/dependent child and requested protective supervision of L.A.

{¶ 6} On February 15, 2013, the Juvenile Court issued an ex parte order suspending Father's and K.W.'s visitation with L.A. The court held a probable cause and shelter care hearing on February 19, 2013, after which it concluded that probable cause existed for the ex parte order.

{¶ 7} On March 15, 2013, following a pre-adjudication hearing, the court granted K.W. visitation with L.A. once per week under the supervision of CCDJFS. The court's entry reflects that it did so based upon the recommendation of the Guardian Ad Litem.

{¶ 8}     On May 1, 2013, the court issued an entry regarding an April 26, 2013 adjudication hearing.   It noted that Mother, Father and K.W. submitted to drug testing prior to the hearing, and that Mother tested negative for all substances, Father tested positive for marijuana and cocaine, and K.W. tested positive for marijuana.   The court granted CCDJFS' request to amend its Complaint to include a charge of neglect pursuant to R.C. 2151.03(A)(2). The court noted that all "parties were in agreement that it is in the best interests of the child for a finding of neglect and dependency and to dismiss the charge of abuse."   The court determined, pending disposition, that Mother retain custody of L.A., that Father's visitation remain suspended, and that K.W. receive one visitation on April 26, 2013, at the agency.   The court set the matter for disposition on May 6, 2013.

{¶ 9}     On May 6, 2013, K.W. filed a Motion for Custody of L.A. At the hearing, Rebekah Neuherz, L.A.'s Guardian Ad Litem, recommended that L.A. remain in Mother's custody "so long as mom continues to work a case plan with the Agency," that L.A. and Mother receive counseling, and that Mother attend parenting classes.   She recommended that L.A. "have parenting time with [K.W.], supervised at this point in time, so that we can figure out maybe what's going on through some counseling at someplace like Gibault and anger management classes for mom."   Neuherz recommended that  "there be no parenting time" for Father, who did not attend the hearing.   Neuherz stated that she did not meet Mother's boyfriend in the course of her investigation.   She also stated that she did not meet with Father, and that she and Father "had a scheduled meeting in my office and he did not appear for it."

{¶ 10}  On cross-examination by counsel for Mother, Neuherz stated that L.A. and Mother have a strong bond. Neuherz stated that L.A. is not old enough "to express her wishes

and concerns," and that she did not interview her regarding the sexual abuse allegations. She stated that she observed K.W. with L.A. during a supervised visit, and that "there is obviously a strong bond between [L.A.] and her grandmother. I think that [L.A.] was fairly calm with grandmother." Neuherz stated, "at least during my visit grandmother handled questions about mom and where mom was and whether [L.A.] could go to her house appropriately I thought." Neuherz testified as follows:

> * * * I did a home visit with [K.W.] this past weekend, and I asked her - - one of my concerns obviously was what happens. Would she allow [Father] to be around during visits because I don't think that's safe for [L.A.] right now. And I asked her. She said she would not. I said what would you do if he just showed up, and she said she would tell him to leave. And I said - - but I pushed her a little bit because I wanted to really know, and I said well, what if he didn't leave. And she said well, then I would probably call the sheriff.

{¶ 11} Neuherz stated K.W. was not an appropriate supervisor for visits between L.A. and Father, and that K.W indicated to her that she does not want to supervise Father's visits. The following exchange occurred:

> Q. Do you also think it would be appropriate for [K.W.] to have unsupervised visits with [L.A.] at this point?
>
> A. I really want to have a better handle of what's going on with [L.A.]. I want [L.A.] to have some counseling before that happens. I think that it's probably best for all parties concerned that that take place because of disclosures that [L.A.] herself made.

Q. Then in terms of disclosures that [L.A.] herself made, what are you referring to?

A. [L.A.'s] interview with, I want to say it's the Child Advocate Center. I don't remember the name of the agency specifically, but where she indicated that [Father] inappropriately touched her and did that at [K.W.'s] house.

Q. * * * And you had indicated in your report you had some concerns, and on the stand you indicated as well you had some concerns about mom. Do you think that those concerns can be remediated through involvement with the Agency?

A. I would certainly hope so.

Q. * * * Are you aware that very recently mom has volunteered to undergo a mental health assessment for the Agency?

A. * * * No. I think that's a good idea, but I was not aware of that.

Q. * * * And are you also aware that my client tested negative last week for illegal drugs on a urine screen?

A. Yes. I was aware of that. I was not - - I am not concerned about mom's current use. I was concerned that mom did not reveal that prior use to the Agency.

* * *

A. Because it was significant.

Q. Are you also aware that she's begun parenting classes?

A. No. I was not aware of that.

Q. Do you think that that's something good for her to do as well?

A. I think that's a great idea.

Q. Do you think at this moment as we stand here if the Agency is involved with this family that [L.A.] is safe with her mother?

A. I'm not as - - I hope so. I am - - I remain concerned - - especially because I have not yet met him - - about mom's relationship with her boyfriend. There has been a history of domestic violence there. That concerns me. But from my discussions with the caseworker, mom has been open to working with the Agency, open to a voluntary plan. I have some concerns. I believe that [L.A.] is physically safe with mom, yeah.

{¶ 12} On cross-examination by counsel for K.W., Neuherz indicated that Mother brought L.A. to K.W.'s visitation, and that when L.A. attempted to get off of Mother's lap when K.W. arrived, Mother "would not let her up. Mom was very hesitant, very - - had an almost fearful kind of demeanor which after a couple minutes kind of transferred onto [L.A.] because when we first got there [L.A.] was very excited to see people and then she got a little hesitant." Neuherz stated, "when we went back, mom said to [L.A.] specifically, do you want to go back with Rebekah and Christina, kind of leaving [K.W.] out of that, and [L.A.] hesitated for a second, which to me appeared to be a result of mom's own hesitancy, because once we got back there, there was no hesitation, no fear, no concern."

**{¶ 13}** Neuherz stated that K.W. lives in the country in a three-bedroom home that is "[v]ery neat, very clean." She stated that K.W.'s home is an appropriate place for a child to visit and live. Neuherz stated that K.W. does not have domestic violence issues. She stated that Mother and Father had suicidal tendencies, but K.W. does not. Regarding the perpetrator of the alleged sexual abuse of L.A., Neuherz stated, "As far as who that is, I don't know that [L.A.] is the most reliable person at this point. I do believe that there have been discussions with her about that. But my biggest concern is getting to the bottom of what has happened to this child." Neuherz stated that ongoing counseling is appropriate to address the issue, but she concluded that "[w]e may never know exactly who did what." Neuherz stated that she is concerned that "there has been some hesitation on [K.W.'s] part to recognize the extent of her son's mental illness," although K.W. "tells me now that she does recognize that." The following exchange occurred:

Q. Does anybody have any evidence whatsoever that [K.W.] allowed [Father] to be around the child while that CPO was in effect?

A. I have not seen any, no. But I think that [for] both your client and the child it makes sense for there to be some counseling underway before things change. It's not my position that your client should never have unsupervised parenting time with [L.A.] It's not my position that she shouldn't have parenting time with [L.A.] at all because there is a bond there, but I think we need to know a little bit more than we do now.

Q. And your - - you believe that comparatively speaking that the child may be at risk when she's * * * with grandma if she's not supervised and comparatively speaking is not at risk with mom based on her whole history of

domestic violence and suicide attempts and cutting herself?

A. I've never said that I believe the child is not at all at risk with mom. In fact, I think my report indicates strictly opposite that. I do have concerns absolutely, but the child has been placed with mom for her entire life, and I believe that she's at least physically safe with mom.

And mom has been willing to work with the Agency as well. So then the question becomes is it best for this child to rip her out of her home based upon concerns that do have some date to them as well. I mean these, the suicide attempts, the cutting, we're talking 2010, 2011.

Q. And at the same period of time has grandma from December of 2010 been involved with visiting this child on a regular basis?

A. Yes. To my knowledge, yes.

Q. So we've cut that down?

A. Yes.

Q. Isn't it possible that that's or even probable that's one of the more stable things that this child's had in her life?

A. Parenting time or time with her grandmother, probably, yeah. That's why I'm not recommending it stop. I think she needs to continue to see her grandmother. She loves her grandmother.

* * *

Q. Do you believe that other than the [Father] factor of maybe being present that there's any other reason that [K.W.] shouldn't be having parenting

time with her granddaughter?

A. That's a pretty big factor to take out, but no. I think that your client did indicate to me that [L.A.] can be a lot to handle for extended periods of time, but that certainly doesn't preclude a night a weekend or something like that, no, of course not. But at this point in time I'm not recommending that that happen. I'm recommending that it continue to be supervised.

I would like to see visitation moved to Gibault though. I think it's a more relaxed atmosphere than where she is now.

Q. The only reason your recommendation would make sense to me, and correct me if I'm wrong, would be if you believe that [L.A.] was sexually molested or touched wrongfully while [K.W.] was in charge of supervision and [Father] touched her?

A. I think you're wrong.

Q. How so?

A. I believe - - I know that that's what [L.A.] said. Whether or not it's the truth I don't know, and that uncertainty leads me to err on the side of caution essentially until such time as we are able to hopefully get more information.

Again, I'm not talking about forever, but I want at least this child to begin counseling.

* * *

Q. Aren't you isolating the child by recommending only a short period of visitation supervised as opposed to a weekend with grandma?

A. I disagree with you.

{¶ 14} On cross-examination by counsel for Father, Neuherz acknowledged that she is not comfortable with her recommendation, and that she does not "think there's any really good answer here." The following exchange occurred:

Q. And I don't want to beat a dead horse, but I know Attorney Meyer asked a few questions about mom's home. And if [Father] lived in another country right now, would you be recommending * * * grandma to have parenting time in the home?

A. Absolutely.

Q. So really it's the concern of [Father] showing up and grandma not doing anything about it?

A. That and I don't know where [Father] is. He won't tell me where he lives. He won't tell me - - he won't come in and see me so yeah. I don't know what's going on there.

{¶ 15} Christina Isenbarger testified that she is "the ongoing social service worker at Champaign County", and that she also sometimes investigates allegations of abuse or neglect. She stated that in February, 2012, there "was an allegation of a physical altercation between [Mother] and her boyfriend," in which Mother threw a bag of cookies at the boyfriend in L.A.'s presence. Isenbarger stated that physical abuse was substantiated, "and we had also indicated neglect, * * * due to the home conditions." Isenbarger stated that counseling was recommended for Mother and the boyfriend, and "they were very inconsistent with participating in counseling."

{¶ 16} Isenbarger also discussed the allegation and investigation of sexual abuse in

June, 2012, in which "[L.A.] was the alleged child victim and [Father] was the alleged perpetrator." According to Isenbarger, "[L.A.] did not disclose any sexual abuse during the interview." Isenbarger stated that the abuse was unsubstantiated, and she stated that L.A. received some counseling but "it wasn't long term."

{¶ 17} Regarding the allegation of abuse in February, 2013, Isenbarger stated that it "was reported to us that [L.A.] was playing with her cousin, who I believe was a four-year-old female, and that the cousin had made a comment to the cousin's mother that [L.A.] had put her finger in her, I believe she called it her pee hole and her butt hole. And when [Mother] asked her why she did that, [L.A.] responded that 'this is what [Father]' does to me." Isenbarger stated that the matter was referred to the Child Advocacy Center, which is affiliated with Nationwide Children's Hospital in Columbus. Isenbarger stated that she was present when L.A. was interviewed in Columbus, and she identified a disc of the interview, in which she stated that L.A. "did disclose that [Father] had touched her. She had disclosed that she had touched [Father's] pee pee and that [Father] had stuck his finger in her butt hole is what she said." Isenbarger stated that she reported the allegations to the Union County Sheriff. She stated that to her knowledge no charges were filed, and "Union County indicated to me that they would be closing it out."

{¶ 18} Isenbarger recommended that custody of L.A. remain with Mother under protective supervision. She noted that L.A. has always lived with Mother, and that Mother "does work voluntarily with us and she always allows access to the child. L.A. appears comfortable in the home when I'm there for visits." Isenbarger stated that she does not know where Father resides. She did not opine regarding K.W.'s visitation with L.A.

{¶ 19} On cross-examination by counsel for Mother, Isenbarger acknowledged that if in fact abuse occurred at K.W.'s home, a concern exists and supervision "could be an issue with [K.W.]." When asked about K.W.'s positive drug test and marijuana usage, Isenbarger responded, "I would be more concerned if I had concerns for her using or it affecting her ability to care for [L.A.], but she doesn't indicate that she uses in front of [L.A.]"

{¶ 20} On cross-examination by counsel for K.W., when asked about the August 22, 2011 report of abuse, Isenbarger stated that L.A. was approximately two years of age, and that "at the time I believe the child was in diapers so to have a rash in that area wouldn't be abnormal." Isenbarger stated that the alleged perpetrator was unknown, and she acknowledged that there "may or may not have been a perpetrator." On cross-examination by counsel for Father regarding the possibility that L.A. may have been coached regarding the allegations of abuse, Isenbarger responded, "There are concerns that someone could've said something to [L.A.], yes." Isenbarger stated that in the course of the interview, "I believe [L.A.] said my mom told me to talk to you." Isenbarger stated that there were several inconsistencies in L.A.'s interview due to the age of the child.

{¶ 21} Dawn Dennis testified on K.W.'s behalf. She stated that she is friends with K.W., and that she knows her "from working at Honda." She further stated that she knows Father, and that she volunteered to supervise his visitation with L.A., along with K.W., in K.W.'s home. She stated that Father's parenting time in the summer of 2012 was on Sundays from 12:00 p.m. to 4:00 p.m., every other week. In the course of the supervision, Dennis stated that she "was with [L.A.] all the time I was there," and that Father was never alone with the child. Dennis stated that K.W. watched over L.A., and that K.W. and L.A. got along "[r]eal great."

Dennis stated that K.W. loves L.A. and protects her, and that Father did not have visitation without K.W.'s supervision. On cross-examination for CCDJFS, Dennis stated that she supervised Father's visitation from June, 2012, until August, 2012. On cross-examination by counsel for Mother, Dennis indicated that she has known K.W. and Father for about 15 years. Dennis stated that K.W. has expressed concerns to her regarding Father's mental health, and "she's mentioned that he needs help." Dennis stated that she is aware that K.W. smokes marijuana

{¶ 22} After the lunch recess, Mother requested and was granted a continuance due to the fact that her step-father was undergoing emergency surgery; the hearing was rescheduled for June 7, 2013, and the court ordered that K.W.'s previous weekly visitation resume in the interim.

{¶ 23} On June 7, 2013, Diane Sparks testified on behalf of Mother, whom she has known for seven and a half years. According to Sparks, Mother is "a friend but like a daughter to me too." She stated that she has babysat for L.A., and that on one such occasion, a year and a half ago, L.A. told her that Father "plays with my pee pee," and "I seen my daddy naked." According to Sparks, these alleged incidents happened at K.W.'s home. Sparks stated that L.A. does not like Father. Regarding K.W.'s marijuana use, Sparks stated that one year K.W. "had a jewelry party and we was out there, and after the jewelry party and all she and her friends went out on the porch and started smoking." When asked if she knew whether K.W. smoked marijuana while L.A. is in her care, Sparks responded, "the way [L.A.] talks once in a great while she smokes something, but I don't take it no further from there. You know, if the little girl wants to say something, she say (sic) it." Sparks acknowledged that she has not observed K.W. smoke marijuana in the presence of L.A.

{¶ 24}   T.H. also testified on behalf of Mother.  According to T.H., she and Mother "think of each other as sisters but now, technically, I'm her step mom."  T.H. stated that once while L.A. was at T.H.'s home, in the summer of 2012, "she was playing and all of a sudden she said, [Father] hurt my pee pee.  And I asked her, I said what.  She said, [Father] hurt my pee pee" with his hand.  T.H. stated that "there was a point when [L.A.] said it quite a bit," and that Father had visitation rights with L.A. at the time.  When asked if she noticed a change in the child's behavior after L.A. visited Father, T.H. stated, "there were a couple times when she stayed down at the house that she would wake up screaming and crying and like she didn't want anybody to touch her.  She was afraid of anybody to touch her."  T.H. further stated, "there was one time that we had her after a visit with [K.W.] and [Father], and she was just a complete horror.  Now, I'm not saying that, you know, I know a two and a half year-old, three year-old, I know they can be bad, but she - - you could tell that there was something going on."  T.H. stated that at that time L.A. was difficult to control, that she had a lot of tantrums, and that she wet the bed.  She stated that the child's behaviors "just started to calm down if she wasn't seeing them."

{¶ 25}   A.H. testified that she is Mother's sister-in-law, and that she has known L.A. since birth.  A.H. stated that she has one child, G.H., who at the time of the hearing was four and a half years old. A.H. stated that L.A. and G.H. play together on the weekends, and that in February, 2013, while the girls were playing at Mother's home, "the girls walked by me, and I heard my daughter say oh, [L.A.] is going to go and play with my pee pee. * * * And I yelled out to [Mother]. * * * And she went in there and she was like why did you play with her pee pee. She goes oh, because [Father] plays with my pee pee."

{¶ 26}   Mother testified that at the time of the hearing, L.A. visited with K.W. every Tuesday at Children's Services, and that LA. previously visited with K.W. every other weekend at K.W.'s home.   When asked about Father's visitation, Mother stated, "[i]n the beginning he was allowed Sundays from like four hours and then it went to six hours, and  [K.W.] was supposed to be supervising it at that time."   Mother stated that Father has lived with K.W. off and on since Mother has known him. Mother stated that she tried to commit suicide in March, 2011, and that she is now on medication which is "very helpful."

{¶ 27}   Mother stated that she does not think K.W. is an appropriate person to care for L.A., and that she does not believe that L.A. is safe with K.W.   Mother stated that she does not believe that K.W. would appropriately supervise Father if he were granted supervised parenting time.   Mother stated that she is able to meet L.A.'s needs and that the child should remain in her care.

{¶ 28}   On cross-examination by counsel for K.W., Mother stated that she takes Lithium and Prozac for  bipolar disorder.   She stated that she never left K.W. alone with L.A.  The following exchange occurred between the court and Mother:

> THE COURT: * * * The court's question is if [Father] is not present, do you think [L.A.] is safe with [K.W.]?
>
> THE WITNESS: No.
>
> THE COURT: Why?
>
> THE WITNESS: She smokes pot.   She gave pot to [Father] which he told the guardian ad litem when he was 10 years-old.   If that happened to her (sic),

what could happen to [L.A.]?  What if she goes and smokes a bowl and [L.A.] is not being supervised?  What could happen to my child?

I don't - - my child is not safe around somebody who thinks it's safe to get high.

Yes, I did it, but I did it before I ever had my children.  And I think I have that right to say whether or not my child is around somebody who thinks it's okay.  If somebody thinks it's okay to do drugs, what else is it okay to do around a child?

Unless something is supervised, how does the Court know that he's really not  there?

THE COURT:  You have been aware that [K.W.] smokes marijuana for some time now; is that correct?

THE WITNESS: Yes.

THE COURT: Do you know about what year that was?

THE WITNESS: 2007, 2008.  It was before I got pregnant with my daughter [L.A.]

THE COURT: So you've been aware of the fact that she smokes marijuana since then, at least since then?

THE WITNESS: Uh-huh.

THE COURT: On numerous occasions in the past you have agreed with [K.W.] having visitation with [L.A.]?

THE WITNESS: She took a drug test at the hospital because her attorney

told her to so she knew it was coming up and she passed it so I couldn't.

THE COURT: Have you agreed in the past with [K.W.] having visitation with [L.A.]?

THE WITNESS: As advise to an attorney, yes, I did (sic).

{¶ 29} Father testified that he was serving a four month sentence on drug charges in North Carolina when the first allegation of sexual abuse was reported. He stated that he was released in November of 2011. He denied ever abusing L.A., and he stated that in the course of his visitations with her he was never unsupervised. He stated that he has been diagnosed with manic depression and takes prescribed medication. Father stated that he lives in an R.V. He denied being diagnosed with paranoid schizophrenia, and he denied being diagnosed with mood disorder, non-specific with psychotic disorder, but he stated that he has mood swings and that "Satan is in my head sometimes." He stated that he uses cocaine and marihuana occasionally, and he stated that his illegal drug use does not affect his prescription medication. In response to a question by the court about visitation, Father responded, "* * * I'd be happy with every other week like every other dad in the world. I'm no threat to [L.A.] or anybody else. This is just one big mess because [Mother] doesn't want us to see [L.A.], and that's her way of getting what she wants. I don't think there's anybody in the world that could give [L.A.] more than my mother."

{¶ 30} The following exchange occurred during cross-examination by counsel for Mother:

Q. * * * Do you recall reporting to Consolidated Care that you believe your mom has mental health issues?

A. No.

Q. You reported that she has anger management issues?

A. No.

Q. She's violent?

A. Can be.

Q. Can be. How can she be violent?

* * *

A. She's not like a violent - - she don't hit or nothing, but, you know, she has a temper like everybody else. You know, she'll yell. You know, she's only human. * * *

Q. Do you typically describe people with a normal temper as violent?

A. No. My mom is not violent.

Q. But you just said a second ago that she can be.

A. She can be, but she never hit somebody or hurt anybody.

Q. Did she ever hit you?

A. I got whipped growing up like every other kid in the world, yeah.

Q. Did she ever hit [L.A.?]

A. Never.

{¶ 31} K.W. testified that she owns her own home, and that she is employed at Honda of America, where she has worked for almost 27 years. She stated that she is 52 years old and lives alone. She stated that in the first six months to a year of L.A.'s life, Mother often stayed at her home with L.A. K.W. stated that L.A. is the "love of my life." According to K.W., Mother

"all of a sudden started seeing [J.] and sent a letter to me saying that she was no longer going to allow [Father] or I to ever seen L.A. again." K.W. stated that she filed for and was granted visitation, and "there was a civil protection order against [Father] that [Father] was not allowed to see her at that time, and that is when [Father] went to North Carolina because he felt like if he was not going to be able to see his child he did not want to be here." K.W. stated that Father did not see L.A. after the civil protection order was in place in her presence. She stated that after Father returned from North Carolina, he was granted visitation for four or five hours every other Sunday during her visitation time. She stated that Father's visitation was supervised by her and her friend, Dawn Dennis. K.W. stated that she always supervised Father, that Dennis was always present, and that Father was never alone with L.A. K.W. stated that there was a subsequent agreed order "that [Father] could visit any time during my visitation, which my visitation was every other weekend from Friday until Sunday, and [Father] could visit any time during that time." K.W. stated that she was required to supervise Father and that she did so.

{¶ 32} K.W. stated that she does not believe that it is good for L.A. to be alone with Father "because of his mental stability." K.W. stated that she is able to provide a stable home for L.A., and that she will comply with any restrictions imposed by the court, including the denial of Father's visitation. She stated that Father lived with her when he returned from North Carolina at the end of 2011. At the time, K.W. stated that her visitation was limited to Sundays, and that Father would leave her home to visit other family during L.A.'s visitation. She stated that Father was never in her home, even for a short period of time, while L.A. was there. After Father was allowed to be present during the visitation, K.W. stated that he "never gave [L.A.] a bath. He never even so much as took her to the rest room because I didn't want any type of

allegations of that sort." K.W. stated that she took her responsibility to supervise Father seriously, and she stated that it is "[a]bsolutely not" possible that L.A. was sexually molested while in her care. Regarding the reported abuse from August of 2011, K.W. stated that she "didn't know anything about that at that time. [Father] wasn't even in the picture. He was in North Carolina." K.W. stated that she can protect L.A.

{¶ 33} K.W. admitted that she smoked marijuana with Father and Mother, and that she still occasionally smokes marijuana. She stated that she very rarely drinks alcohol. K.W. stated that she has never smoked marijuana or consumed alcohol, or used any other illegal drugs while L.A. is in her care. She stated that Father lived in her home upon his return from North Carolina until October, 2012. She stated that Father has not returned to her home to live, and that there are no plans for him to do so. She said her home has three bedrooms on three acres, and that L.A. loves being there. K.W. stated that L.A. had "a whole closet full of clothes, brand new, nice clothes" at K.W.'s house. She stated that when L.A. spends the night, she sleeps with K.W., but that L.A. also has her own room with "a bed and there's toys and stuff in there."

{¶ 34} Regarding the statements that L.A. made regarding inappropriate touching by Father, K.W. stated, "I believe that she might think she's telling the truth, but I think she's telling the truth of what someone has told her and led her to believe." K.W. acknowledged that Father "has mental health issues." When asked if she believed that she can keep Father from visiting L.A. at her house, K.W. responded, "[o]f course I can." K.W. stated that if Father came to her home while L.A. was present, she would "definitely" call the sheriff.

{¶ 35} At the close of the hearing, counsel for Mother advised the court that Mother wanted "[t]o have the child remain with her where she's been for her entire life. No parenting time for dad, supervised visitation only for grandma." The juvenile court determined as follows:

* * * the Court finds that it is in the best interest of [L.A.] to remain in the legal custody of her mother * * * . The mother has been the primary caregiver since birth, there are no physical safety concerns if [L.A.] remains with her mother, there is a strong bond between [L.A.] and her mother, and the mother actively cooperates and participates with CCDJFS. However, the Court also believes that the involvement with CCDJFS should continue due to concerns regarding home conditions and mother's live-in boyfriend.

The Court finds that the father has severe mental health issues, has continued his drug and alcohol use (possibly abuse), has refused to cooperate at all with CCDJFS or the Guardian ad Litem, and

has never had stable housing. Therefore, the Court has serious concerns regarding any parenting time for the father. Furthermore, the ongoing revelations by [L.A.] of inappropriate touching by the father cannot be ignored.

As for the paternal grandmother, the Court finds that she is and has been an important figure in [L.A.'s] life. They have a strong bond and the Court believes that having extended family in her life can only benefit [L.A.].

The court ordered that K.W. "[s]hall have visitation with [L.A.] the second weekend of every

month from Saturday at 9:00 A.M. to Sunday at 5:00 P.M.."

{¶ 36}   Mother asserts four assignments of error which we will consider together.   They are as follows:

"THE COURT IS ENDANGERING THE SAFETY OF THE MINOR CHILD BY ALLOWING PARENTING TIME TO OCCUR WITH PATERNAL GRANDMOTHER AS SHE IS KNOWN DRUG ABUSER."

And,

"THE COURT IS ENDANGERING THE SAFETY OF THE MINOR CHILD BY ALLOWING PARENTING TIME TO OCCUR WITH PATERNAL GRANDMOTHER AS SHE HAS PREVIOUSLY FAILED TO PROTECT THE CHILD FROM SEXUAL ABUSE."

And,

"THE COURT IS ENDANGERING THE SAFETY OF THE MINOR CHILD BY DISREGARDING THE GUARDIAN AD LITEM'S RECOMMENDATION THAT PATERNAL GRANDMOTHER'S VISITATION BE SUPERVISED."

And,

"THE TRIAL COURT DID NOT APPLY THE BEST INTEREST STANDARD IN DETERMINING WHETHER CONTINUING COMPANIONSHIP TIME WAS APPROPRIATE."

{¶ 37}   "We review the trial court's decision regarding nonparent visitation and its

corresponding analysis of the best-interest factors, including the wishes of a parent, for an abuse of discretion." *In re F.D.*, 2d Dist. Montgomery No. 23358, 2009-Ohio-4788, ¶ 10. "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. *Huffman v. Hair Surgeons, Inc.*, 19 Ohio St.3d 83, 482 N.E.2d 1248 (1985). A decision is unreasonable if there is no sound reasoning process that would support that decision. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 553 N.E.2d 597 (1990). *Feldmiller v. Feldmiller,* 2d Dist. Montgomery No. 24989, 2012-Ohio-4621, ¶ 7.

{¶ 38} Regarding Mother's assertion in her first assigned error that K.W. is a "known drug abuser," the record does not support such a conclusion. Mother merely speculated about K.W.'s marijuana use in L.A.'s presence, and she did not present any evidence thereof. While K.W. admitted to occasional marijuana usage, she testified that she does not use marijuana in L.A.'s presence, and the court clearly credited her testimony over Mother's speculation. We note that Isenbarger's testimony supported K.W.'s regarding her marijuana usage. We cannot conclude that K.W.'s drug use endangers L.A.'s safety, and an abuse of discretion is not demonstrated. Mother's first assigned error is overruled.

{¶ 39} Regarding Mother's second assigned error, the record further does not support a conclusion that K.W. previously failed to protect L.A. from sexual abuse. Father was in prison at the time of the first reported abuse, and there was no evidence that K.W. allowed Father to violate the CPO subsequently issued against him. Neuherz stated that she had seen no such evidence, and K.W., Dennis, and Father testified that Father was never alone with L.A. at K.W.'s home. The trial court clearly credited their testimony over that of Sparks' regarding alleged

incidents of abuse in K.W.'s home, and that of T.H. and A.H. regarding L.A.'s allegations of abuse by Father. We defer to the trial court's assessment of credibility. We note that Neuherz, Isenbarger and K.W. each expressed concerns regarding the veracity of L.A.'s allegations of sexual abuse, and each suggested that the child may have been coached. K.W. stated that she understands that it is not good for L.A. to be in Father's presence, due to his mental health problems, and she stated that she will comply with any restrictions placed upon her by the court. K.W. stated that she is able to protect L.A., and we conclude that L.A.'s safety is not endangered by K.W.'s failure to protect her. An abuse of discretion is not demonstrated, and Mother's second assigned error is overruled.

{¶ 40} Regarding Mother's third assigned error, as K.W. asserts, "[a]lthough a juvenile court must consider the recommendation of the guardian ad litem, it is not required to follow the recommendation. *In re Haywood*, Allen App. Nos. 1-99-93, 1-99-94, 1-99-95, 2000-Ohio-1740." *In re P.P.*, 2d Dist. Montgomery No. 19582, 2003-Ohio-1051, ¶ 24. We note that Neuherz testified that her concerns were based upon a lack of knowledge regarding the identity of L.A.'s abuser, Father's whereabouts, Mother's unknown boyfriend, and whether or not K.W. would contact authorities to protect L.A. As noted above, Neuherz acknowledged that she has not seen any evidence that K.W. allowed L.A. to be in Father's presence while the C.P.O. was in place, and while she expressed concern that K.W. advised her that she would "*probably* call the sheriff" if Father "showed up," K.W. testified that she would "*definitely*" contact authorities if Father appeared at her home while L.A. is there. Further, Neuherz acknowledged, consistent with K.W.'s and Dennis' testimony, that K.W. understands the extent of Father's mental illness. We cannot conclude that the court abused its discretion and endangered L.A.'s safety by

disregarding Neuherz's recommendation regarding the supervision of K.W.'s visitation, and Mother's third assigned error is overruled.

{¶ 41} Finally, regarding Mother's fourth assigned error, she directs our attention to R.C. 3109.051(D), which provides the factors for the court to consider in determining whether to grant visitation rights to a grandparent. Specifically, Mother cites the following factors, which she alleges the court ignored:

* * *

(4) The age of the child;

* * *

(7) The health and safety of the child;

* * *

(9) The mental and physical health of all parties;

* * *

(15) In relation to requested companionship or visitation by a person other than a parent, the wishes and concerns of the child's parents, as expressed by them to the court.

(16) Any other factor in the best interest of the child.

{¶ 42} Pursuant to R.C. 3109.051(D)(4) and (7), Mother asserts that L.A., due to her age, "does not have the ability to self-protect from abuse, nor does she have the knowledge to know if [K.W.] is under the influence of drugs or alcohol," and that L.A.'s safety "has been repeatedly jeopardized" in K.W.'s home. As noted above, the record does not support the conclusion that K.W. uses drugs in L.A.'s presence, or that she will fail to protect L.A. or

jeopardize the child's safety. Regarding the mental and physical health of all parties, pursuant to R.C. 3109.051(D)(9), Mother asserts that testimony "was provided that father has severe mental deficits. Testimony was provided that Grandmother has an anger problem as well as a substance abuse issue." As previously noted, K.W. understands the extent of Father's mental health problems and the need to protect L.A. The only testimony regarding K.W.'s alleged anger problem came from Father, and his testimony was inconsistent and contradictory. Neuherz testified that K.W. does not have any domestic violence issues.

{¶ 43} Regarding the trial court's failure to follow Mother's wishes regarding K.W.'s visitation, we note that in *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054 147 L.Ed.2d 49 (2000), the Supreme Court "recognized that parents have a fundamental right to make decisions regarding the care, custody, and control of their children and established that a parent's decision regarding nonparent visitation is entitled to 'some special weight.'" *In re F.D.*, 2d Dist. Montgomery No. 23358, 2009-Ohio-4788, ¶ 6. Before granting visitation, the court must consider all relevant factors, including those set forth in R.C. 3109.051(D). *In re F.D.*, ¶ 7. Regarding R.C. 3109.051(D)(15), this Court noted in *In re F.D.:*

> * * * "[A]trial court must give special weight to [this] factor in making its visitation determination, thus protecting a parent's due process rights." * * * This does not mean that a parent's wishes regarding nonparent visitation necessarily will prevail. * * * "Ohio's nonparental visitation statutes not only allow the trial court to afford parental decisions the requisite special weight, but they also allow the court to take into consideration the best interest of the child and balance that interest against the parent's desires." * * * "[W]hile *Troxel* states that there is a

presumption that fit parents act in the best interest of their children, nothing in *Troxel* indicates that this presumption is irrefutable. The trial court's analysis of the best interests of a child need not end once a parent has articulated his or her wishes. By stating in *Troxel* that a trial court must accord at least some special weight to the parent's wishes, the United States Supreme Court plurality did not declare that factor to be the sole determinant of the child's best interest. Moreover, nothing in *Troxel* suggests that a parent's wishes should be placed before a child's best interest." * * * *Id*., ¶ 8.

{¶ 44} While Mother requested that K.W.'s visitation be supervised, Mother's wishes are not the sole determinant of L.A.'s best interest, and for the reasons set forth above, namely that K.W. is not a drug abuser, and that she can protect L.A., we conclude that the trial court's decision regarding the grant of unsupervised visitation to K.W. is in L.A.'s best interest and not an abuse of discretion; the record reflects the strong bond between L.A. and K.W., K.W.'s home is neat, clean and an appropriate place for the child to visit, and as the trial court concluded, "having extended family in her life can only benefit [L.A.]". There being no merit to Mother's fourth assigned error, it is overruled.

{¶ 45} Since an abuse of discretion is not demonstrated, the judgment of the trial court is affirmed.

. . . . . . . . . .

HALL, J., concurs.

WELBAUM, J., concurring in judgment:

{¶ 46} The majority concluded that K.W. was not a drug abuser. Actually, K.W.'s

admission corroborated other evidence that she smoked marijuana occasionally. However, K.W. denied this activity occurred when she supervised L.A. The trial court credited K.W.'s testimony to be credible. Therefore, I agree with the majority and find no abuse of discretion.

. . . . . . . . . .

Copies mailed to:

Cassie L. Screngi
Richard A. Meyer
Jane Napier
Kirk Ellis
Rebekah S. Neuherz
Hon. Lori L. Reisinger